**STATE of Tennessee, Appellee,**

v.

**Sam DELK, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Jan. 8, 1985.

Jerry L. Smith, Asst. Atty. Gen., Nashville, Douglas Bates, Dist. Atty. Gen., Centerville, for appellee.

William P. Redick, Jr., Lionel R. Barrett, Jr., Nashville, for appellant.

## OPINION

DAUGHTREY, Judge.

The defendant, Sam Delk, was convicted of the second degree murder of Harry Gipson and was sentenced to 10 years in prison. On appeal, Delk alleges that the circumstantial evidence used to convict him was insufficient, that he should have been allowed to inspect the notes of a TBI agent, that the jury panel was not impartial, that certain evidence was improperly admitted at trial, and that he should have been allowed to introduce the results of a lie detector test and of a "truth serum" interview. We find no reversible error in connection with these issues and, accordingly, we sustain Delk's conviction.

The evidence adduced at trial showed that Harry Gipson, the owner of Gipson's Wayside Grocery in Centerville, was killed by a gunshot that penetrated his heart and lungs. When his body was found inside the market shortly after 6:00 p.m. on November 12, 1975, the victim had $501 in his pocket, and the open cash register drawer contained $600. Additionally, the register had last recorded a fifty cent transaction, and the store's telephone was found dangling off the hook.

The testimony given at a previous trial by Burford Hornby, now deceased, was read to the jury. In that testimony, Hornby claimed that he had left the grocery at exactly ten minutes before six on the evening of the murder. When he left, only 13-year-old Sydney Pigg remained in the store with Gipson. Moreover, as he departed, Hornby saw no one else on Columbia Avenue in front of the market.

Sydney Pigg testified that he visited the store that night for 15–20 minutes and left approximately five minutes after Mr. Hornby did. When Pigg left, Mr. Gipson was the only person in the market. As Pigg walked home from the grocery, he observed defendant Sam Delk walking toward him on the opposite side of Columbia Avenue. The two neighbors greeted each other but continued on their respective ways. Later, when he glanced back toward Delk, Pigg saw the defendant cross the street and walk toward Gipson's Wayside Grocery.

Louise Chavers lived in the second building south of the victim's store on Columbia Avenue. When her clock was "straight up and down" at 6:00 on the evening of the murder, she exited from her back door, crossed her yard, and called her tenant, a Mr. Small, to supper. Small lived in another of Louise Chavers's buildings, next to the market. Chavers testified that she saw no one else in the area at that time. After returning to her home, she turned off the stove and heard a car horn blow from across the street. Looking through her front door, Chavers saw Floyd Stone and Charles "Goon" Gilbert at the home of another neighbor, Vodrine Walker.

From the Walker residence, Stone and Gilbert drove around a horseshoe-shaped drive and stopped where the drive ended at Columbia Avenue, just across from Gipson's grocery. From there the men could see a body lying in the store, and they went to investigate. After searching the store for four to five minutes, according to Stone, the men telephoned the police. The police dispatcher testified that the call was received at approximately 6:09 p.m.

Sheriff Frank Atkinson testified that he timed witness re-enactments of the events of the evening of November 12, 1975. From the time Sydney Pigg left the grocery until his encounter with the defendant, 35 seconds elapsed. Forty-five seconds were required to retrace the path that the defendant took from where he spoke to Pigg to the market. It took Louise Chavers one minute and 17 seconds to leave her kitchen, walk to Mr. Small's lodging, return to her home, and reach the front door to look out toward Vodrine Walker's house. Finally, one minute and 50 seconds were necessary for Stone to pick up "Goon" Gilbert at the Walker home, drive around to Columbia Avenue, and enter the grocery.

Atkinson also interviewed the defendant the night after the murder. From him, the sheriff first learned of Delk's exchange of greetings with Sydney Pigg and of Louise Chavers's trip to her tenant's lodging to call Mr. Small to supper.

The defendant also told Sheriff Atkinson that, after seeing Pigg, he entered the market to purchase cigarettes and matches. The cigarettes cost 50 cents and the matches two cents. The bill was paid with a five dollar bill and he received $4.48 in change. The defendant claimed that Mr. Gipson talked on the telephone for the entire 30–45 seconds that the defendant was in the store.

The defendant stated further that after leaving the grocery, he walked past Louise Chavers's home and saw her walking toward Mr. Small's quarters. He thought Chavers had also seen him, and he heard

her call Small for supper. Passing the Chavers residence, the defendant then continued down Columbia Avenue to Harry Gipson's tavern, which he entered at approximately 6:05 p.m.

The state attempted to discredit the defendant's account of the occurrences of the night of the murder through the testimony of several witnesses. A number of neighborhood residents testified that the defendant did not usually enter the grocery. Rather, because he owed Mr. Gipson for a six-pack of beer and for damage done to a door of the Gipson tavern, they said that the defendant ordinarily would wait outside the store and give money to other individuals to purchase the necessary supplies from the market.

Furthermore, witnesses were offered to support the state's theory that the killer did not flee the scene via Columbia Avenue. Instead, Sheriff Atkinson theorized that the murderer left the grocery by traveling between the store and Mr. Small's quarters and then through a wooded ravine behind the Chavers's property to the tavern.

Atkinson testified that when re-enacting the events of November 12, 1975, he could not hear Louise Chavers call to Mr. Small from the spot where the defendant claimed to have been. The Sheriff could, however, hear the dinner call while standing near that pathway between Mr. Small's residence and the grocery. Moreover, the sheriff testified that mud found on a wooden fence in the ravine indicated that someone had crossed the gully near the time of the killing.

Other evidence introduced by the state to bolster its theory included the testimony of sisters Melva Vanessa (Sweety) Campbell and Phyllis Campbell Price. At the time of the murder, the Campbells lived behind and to the north of Gipson's Wayside Grocery. At approximately 6:00 p.m. on November 12, 1975, the Campbell's dog, Trixie, began barking as if someone were walking nearby. On cross-examination, however, the sisters testified that Trixie barked only at strangers and had never barked at the defendant, who was a frequent visitor at the Campbell home.

Rose Clayborne testified that she lived between Centerville and Dickson, approximately one-half mile from the Duck River Bridge. Before she went to bed at 11:30 p.m. on November 12, 1975, Clayborne looked out her window and saw nothing out of the ordinary in her yard. When she awoke the next day between 8:30 and 9:00 a.m., however, she found papers scattered over her property. A closer examination of the material indicated that the papers included both personal and business information of Harry Gipson.

Cheryl Weaver and Martha Dansby Elliott testified that they drove from Dickson to Centerville with the defendant's twin brother, Dan Delk, on the evening of Harry Gipson's murder. That night, Dan and the defendant played cards at the Piggs' home before leaving to pick up a friend from work at the Genesco Plant. When the two women and Dan Delk drove back to Dickson later that night, Dan momentarily swerved off the right side of the road onto the shoulder before righting the car. Although later testimony showed that Dan Delk swerved near the property of Rose Clayborne, Cheryl Weaver, Martha Elliott, and Dan Delk all stated unequivocally that Delk threw nothing out of the car that night and that no one opened the car windows or doors anywhere along the road. Elliott did testify, however, that Delk "pushed" against the taped vent window.

Additional trial testimony was offered by Ulysses Gipson, the victim's brother. He testified that the defendant had come to the store at about noon on the day of the murder and had stood outside the market until approximately 2:00 p.m. Also, Fred Stone testified that some time before the murder but after the defendant had damaged the tavern door, Stone had said jokingly, "Man, if y'all don't quit breaking people's doors, somebody is going to be kicking your behind and put a knot on your head." Stone said Delk responded that "that goes two ways."

The defendant denied that he killed Mr. Gipson or that he owned or used a handgun at the time of the murder. He claimed further that he had no reluctance to enter the store and had no hard feelings toward Harry Gipson. Both Sam and Dan Delk denied that any papers were passed between them on the night of the murder.

Finally, state's witness Wright Fowlkes testified that the defendant was in Gipson's tavern when the news of Harry Gipson's death was announced. Like the other people present at the time, the defendant reportedly mourned at the news and went to the store with the others to watch the occurrences there. Fowlkes claimed further that when the defendant first entered the tavern that night, he looked "lonely" but was not perspiring or out of breath.

■ Based upon this controverted circumstantial evidence, the jury convicted the defendant of second degree murder. Of course the trial judge had instructed the jury on the law of circumstantial evidence and on the heavy burden of proof in a case composed entirely of circumstantial evidence. The standard of review on appeal, however, is the same for circumstantial evidence cases as for all other cases. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn.1977). In reviewing the legal sufficiency of the evidence, this court must take the strongest legitimate view of the evidence in the state's favor and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Patton*, 593 S.W.2d 913, 916–917 (Tenn.1979); Tennessee Rule of Appellate Procedure 13(e).

In this case, the state has shown that the defendant was outside the market shortly after 6:00 p.m. Only then could he have overheard Louise Chavers calling Mr. Small to supper. Furthermore, "Goon" Gilbert and Floyd Stone, by their account, discovered the victim's body at approxi-

mately 6:04 p.m. The jury obviously concluded that no reasonable theory would allow for the unnoticed entrance, exit, and disappearance of another individual from the store in the short interval of time between the defendant's departure from the grocery and Gilbert and Stone's arrival.

Furthermore, the jury obviously accredited the testimony of Louise Chavers that she did not see the defendant walking on Columbia Avenue as she called her tenant to eat. Rather, the jury must have believed the evidence offered by Sheriff Atkinson that the defendant had to have been between the store and Small's lodging in order to hear the supper summons. The evidence of fresh mud on the fence located in the ravine behind the Chavers's home and between the grocery and the tavern also supported the state's theory that the killer left the scene by way of the wooded ravine and not Columbia Avenue. Moreover, the jury could find that Dan Delk disposed of papers taken from the store by the defendant to remove evidence of Sam Delk's indebtedness to the victim. Even though the witnesses in the car with Dan Delk testified that he had not opened the windows or thrown anything out of the car at the point where he swerved off the road and where the papers were found, one witness claimed that Dan Delk had been pushing against the vent window when his car left the · road at or near that location.

The proof also establishes a motive for Delk to kill Gipson. In view of the $1100 left on the premises after the murder, the jury must have thought it unlikely that Gipson's assailant was an ordinary robber.

■ There is no doubt that the lack of evidence in this trial resulted in a close case.* As a reviewing court, however, we are not permitted to ask ourselves whether we believe that the evidence establishes guilt beyond a reasonable doubt. *Jackson v. Virginia, supra,* 403 U.S. at 318–319, 99 S.Ct. at 2788–2789. Instead, the question

---

\* The Tennessee Supreme Court and the federal courts have split on the issue of the sufficiency of the evidence. *See Delk v. State,* 590 S.W.2d 435 (Tenn.1979); *Delk v. Atkinson,* 498 F.Supp. 1282 (M.D.Tenn.1980); *Delk v. Atkinson,* 665 F.2d 90 (6th Cir.1981).

is whether, when the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could find the evidence sufficient to support the defendant's conviction for second degree murder. *Id.* We conclude that the proof before us is sufficient to meet the *Jackson* test, and we decline to reverse on this basis.

The defendant also contends that he should have been allowed to inspect and copy the notes taken by TBI Agent Richard Wright during an interview of the defendant conducted by Sheriff Atkinson. Apparently, these notes were not a verbatim account of Delk's statement, but were a summary that had been incorporated by Agent Wright into his overall report of the case. Prior to trial, defense attorneys requested copies of Wright's report of the statement given by the defendant while in custody. The state refused to give Agent Wright's notes of that interview to the defense, however, claiming that the attorneys knew of the substance of Delk's statement from testimony at a prior trial in this matter. Later, the District Attorney General relented and read aloud to the defense attorneys that portion of Wright's report relating to the defendant's statement. The defendant maintains that he was entitled to more.

Tennessee Rule of Criminal Procedure 16(a)(1)(A) provides:

> Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general; the substance of any oral statement which the state intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogations by any person then known to the defendant to be a law enforcement officer. . . .

■ The state now argues that Agent Wright's notes do not constitute a "written statement" for Rule 16 purposes. The state further insists that no error was committed in this case because the statement was merely an oral one and the state provided defense attorneys with the "substance" of the statement by reading relevant portions of the report to them. We agree that if the statement is considered an oral one, no Rule 16 violation occurred, because the defendant was provided with the substance of that oral statement. On the other hand, the defendant argues that by virtue of Agent Wright's notes, the statement in question was actually a "recorded statement" for purposes of Rule 16(a)(1)(A) and that he had an absolute right to "inspect and copy the notes" under the terms of the rule.

■ In *State v. Hicks,* 618 S.W.2d 510, 514 (Tenn.Crim.App.1981), this court, citing *United States v. Hasiwar,* 299 F.Supp. 1053, 1055 (S.D.N.Y.1969), concluded that Rule 16 applies not only to "written, recorded and transcribed verbatim statements by a criminal defendant, but also written 'interpretation[s] or summar[ies]' of statements made by the accused, or a memorandum of an interview 'even though not verbatim and not signed' by the defendant." *See also United States v. Johnson,* 525 F.2d 999, 1004 (2nd Cir.1975), *cert. denied* in 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (written summary of the defendant's statement is discoverable); *State v. Sherburne,* 366 A.2d 1127, 1131 (Me. 1976) (handwritten notes of an interrogation are discoverable); *People v. Bennett,* 75 Misc.2d 1040, 349 N.Y.S.2d 506, 519 (1973) (oral statement by the defendant "reflected or summarized in any report, notes, or memoranda" is discoverable; the manner in which the statement is written or recorded is immaterial); *State v. Scott,* 479 S.W.2d 438, 442–443 (Mo.1972) (notes of an oral statement are discoverable). It thus appears that Wright's notes of the interview with the defendant constituted an "interpretation or summary" of the defendant's statement and, under *Hicks, supra,* were subject to full discovery by the defendant upon request. This being so, the trial court erred in refusing to allow de-

fense attorneys to inspect and copy pertinent portions of Wright's report.

The crucial inquiry becomes whether or not this error was harmless, under all the circumstances of the case. The prosecution maintains that its reading of Agent Wright's notes to the defendant's attorneys fulfilled the state's obligations under Rule 16(a)(1)(A). The defense contends, however, that their ability to cross-examine and impeach state witnesses was hampered when they were forced to rely upon only the notes they took during the pretrial reading of portions of Wright's report.

For example, although Sheriff Atkinson testified that Delk claimed to have been inside Gipson's Wayside Grocery for 30–45 seconds on the evening of the murder, Wright's notes indicated that the defendant said that he had been in the store for a minute and a half. Although this inconsistency came to light as the result of the limited discovery offered the defendant, he argues that other possible inconsistencies could not be explored adequately because Wright's notes were only read aloud.

Because portions of Wright's report in this case constituted a "recorded statement" by the defendant under Rule 16(a)(1)(A), he had a right to inspect or copy the report upon request. Moreover, allowing the defendant to examine relevant portions of the report would have worked no real hardship upon the District Attorney—adequate precautions were undoubtedly available to ensure that conclusions or theories reflected in the report would not be seen by the defendant.

■ Nevertheless, it appears from the record that the defendant's attorneys were provided with those portions of Wright's report to which they were entitled, even if not in the form prescribed by Rule 16. They were able to use the information they received to cross-examine strategic prosecution witnesses at trial, and thus no actual prejudice resulted because of the trial court's error. If there were other discoverable matters in Wright's report to which the defendant was entitled but which were withheld, as the defendant now speculates,

no prejudice can be found because the report was not made a part of the record and is not before us for review. Nor do we have a copy of the notes taken by the defense attorneys during the reading of the report, so there is no basis for a comparison between the two. Under these circumstances, we decline to hold that the Rule 16 error committed below was reversible error.

The defendant next alleges that the trial court should have dismissed for cause all jurors who were aware of the prior trial in this matter. In support of his position, the defendant cites *Sommerville v. State*, 521 S.W.2d 792, 797 (Tenn.1975), for the proposition that "a juror with knowledge of the verdict and sentence of the prior jury shall be subject to challenge for cause, unless the examination shows, unequivocally, that he can be impartial, and that his judgment will not be affected by such knowledge."

■ Twelve of the 14 jurors and alternates who heard this case claimed to have received varying amounts of information about the prior trial. All 14 individuals claimed unequivocally, however, that they would not be swayed by that knowledge and would be unbiased in their decision-making. The defendant has failed to show that the judgment of any juror was affected by the knowledge of the prior proceedings. Indeed, the ten-year sentence set by the jury at this second trial was far lower than the 50-year sentence imposed at Delk's initial trial. This fact in itself tends to establish that the jury was not swayed prejudicially by prior knowledge of the case.

In another issue, the defendant contends that the trial court erred in allowing into evidence the discarded papers from the victim's store that were found in Rose Clayborne's yard. The defendant argues that the papers were irrelevant because they were not proven to have been taken from the grocery by the defendant on the evening of the murder, or to have been in defendant's possession at any time, or to have been discarded by Dan Delk.

■ This identical issue was found to be without merit by our state Supreme Court in *Delk v. State*, 590 S.W.2d 435, 439 (Tenn. 1979). That holding is thus the law of the case and must be followed here unless clearly erroneous.

The Supreme Court reasoned that:

The time of [the papers'] appearance on Rose Claiborne's [sic] property gave rise to an inference that they may have been taken by the killer of Harry Gibson [sic]. Likewise, it was relevant to show that defendant had the opportunity to hand any papers he may have taken from the market to his brother, Dan Delk, and that Dan Delk traversed the road past Rose Claiborne's [sic] house during the time frame of their appearance at that place.... The fact that the State failed to elicit from the two passengers testimony that Dan Delk did in fact throw papers from the car does not render their testimony inadmissible, but merely goes to the probative value of the State's theory of defendant's complicity in the episode....

*Id.*

The Supreme Court's decision on the relevance of the evidence was echoed by the Sixth Circuit Court of Appeals in *Delk v. Atkinson*, 665 F.2d 90, 100 (6th Cir.1981). Since the prior holding on this issue cannot be said to be clearly erroneous, it must also be applied to the present case.

The defendant next contends that the trial court erred in admitting certain demonstrative evidence. He argues that he was prejudiced by admission of two diagrams which were not drawn to scale, by photographs of the crime scene taken after certain objects had been moved, and by photographs of the deceased's body.

■ The admission of diagrams is largely discretionary with the trial judge, and his exercise of that discretion will not be disturbed on review unless an abuse is clearly demonstrated. *Cole v. State*, 512 S.W.2d 598, 602 (Tenn.Crim.App.1974). The two diagrams at issue in this case, one of the inside of the market and the other of the area surrounding the store, were admit-

tedly not drawn to scale. The jury was informed of that fact on numerous occasions, however. Moreover, photographs both of the store's interior and of the neighborhood were introduced to allow the jury to view a scaled representation of the crime scene. We find that no prejudice resulted from admission of the diagrams into evidence.

■ The admission of photographs is likewise within the discretion of the trial judge. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978). A court's ruling in this respect will not be overturned on appeal except upon a clear showing of an abuse of discretion. *Id.*

■ In this case, pictures of the inside of Gipson's Wayside Market were introduced to familiarize the jury with the crime scene. Although one of the photographs does depict the floor of the store strewn with chewing gum and another picture of the same area does not, we do not believe that this fact alone renders the photos inadmissible. The jury was apprised of the fact that the crime scene had been altered prior to the taking of one of the photographs. Any such discrepancy could be considered by the jury in its weighing of the evidence, but it would not necessarily preclude introduction of the photographs. We find no abuse of the trial judge's discretion in the admission of the photographs of the store's interior.

■ The defendant also insists that the trial court erred in admitting pictures of the victim's body because the prejudicial effect of the photographs outweighed any probative value they had. We disagree. The pictures included in the record are not in color and cannot be said to be "gruesome" or "horrifying." *Compare State v. Banks, supra.* In fact, the photographs contain tape over the victim's head and chest area, and at some point in the history of this case, the tape was pulled back, peeling part of the photograph with it. In this condition, the pictures now show no blood or gunshot wounds. Clearly, the probative value of the evidence as a vehicle to

establish the existence of a criminal homicide far outweighs the prejudicial effect, if any, from these photographs. The trial judge did not abuse his discretion in admitting the photographs into evidence.

In his final issue, the defendant alleges error in the trial judge's decision not to admit the results of a polygraph examination or of a "truth serum" interview of the defendant. He argues that the evidence is probative of guilt or innocence and that polygraph test results are gaining increased acceptance as admissible evidence.

In Tennessee, the results of a lie detector test are inadmissible, as are the circumstances surrounding the taking of the test. *Grant v. State*, 213 Tenn. 440, 374 S.W.2d 391, 392 (1964); *State v. Hailey*, 658 S.W.2d 547, 551 (Tenn.Crim.App. 1983); *Hembree v. State*, 546 S.W.2d 235, 240 (Tenn.Crim.App.1976). The trial judge did not err in refusing to admit that evidence.

We are unaware of any Tennessee case dealing with the admissibility of results of a "truth serum" interview. We see no reason, however, to reject the position taken by courts in other jurisdictions that such results are inadmissible on the issue of guilt or innocence. *See, e.g., Zeigler v. State*, 402 So.2d 365, 373 (Fla.1981), *cert. denied* 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153; *State v. Conley*, 6 Kan. App. 280, 627 P.2d 1174, 1178 (1981). *See generally* Torcia, *Wharton's Criminal Evidence*, § 630, pp. 249–252 (13th ed.); 22A C.J.S., *Criminal Law*, § 645(1), pp. 524–525.

The judgment of the trial court is affirmed.

O'BRIEN and TATUM, JJ., concur.