# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 26, 2002

## STEVE MASON v. STATE OF TENNESSEE

**Post-Conviction Appeal from the Circuit Court for Maury County**
**No. 8516     Jim T. Hamilton, Judge**

---

### No. M2002-00414-CCA-R3-PC - Filed September 2, 2003

---

The petitioner, Steve Mason, brings the instant appeal of the post-conviction court's denial of his petition for relief. The petitioner stands convicted of first degree murder and attempted first degree murder. In this appeal, he alleges that he is entitled to post-conviction relief on the basis that the facts introduced at trial are insufficient to support his convictions and because he received ineffective assistance of trial counsel.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Steve Mason.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; and Mike Bottoms, District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual Background

When this Court reviewed the petitioner's direct appeal of his convictions and sentence, we summarized the facts of his case as follows:

> On August 4, 1994, Timothy McGill and Jesse Tate Jones were shot numerous times following a crap game which took place on Broadway Avenue in Mt. Pleasant. McGill suffered three gunshot wounds and died from these injuries. Jones, McGill's stepfather, was shot twice. After surgery and hospitalization, he recovered fully and suffered no permanent injuries. Jones and other eyewitnesses identified

appellant as the assailant. Several days after the incident, appellant turned himself in to authorities in Louisville, Kentucky and was returned to this State for prosecution.

The State's proof demonstrated that shooting dice, or "craps" as it is commonly called, was played regularly in and around the Broadway Avenue area of Mt. Pleasant. The location is a "high crime area." On the evening of August 3, 1994, a game began at about 8:00 p.m. and continued well into the morning hours of August 4, concluding around 3:00 a.m. The victims were in control of the game, at least one of them acting as "houseman" of the game at all times. The "houseman" is the person who supplies the dice and oversees the betting. Throughout the evening, the game had varying numbers of participants, including as many as twelve people at one point. Appellant arrived on Broadway around 11:00 p.m. and remained until the game's conclusion, but he only participated in the game for a short while. He left the area once around 2:00 a.m. and was gone for about 20 to 30 minutes. Upon his return, those present at the game noticed that appellant had changed clothes. Prior to leaving, appellant had been dressed in light-colored clothing, primarily a white T-shirt and white pants, When he returned, he was dressed in all black, including his shoes, shorts, shirt and jacket.

The testimony of Jesse Tate Jones, the surviving victim, revealed that appellant was present as the game began to draw to a close. Anthony Webster, appellant's roommate and friend, had just lost a sum of money and declined to play the game any longer. Jones urged Webster to continue playing. Webster responded that he might play again tomorrow. Jones replied, "It may not be no tomorrow." Appellant then jumped up from where he was sitting, pulled out a gun and said, "That's what I say, won't be no tomorrow." He then began firing the weapon. Appellant first shot Jones in the jaw, who fell facedown on the street. Appellant then turned the gun on McGill and shot him once in the upper portion of his chest, just below the neck. He immediately whirled back toward Jones and shot him again in the back of the neck, as Jones lay facedown on the street. By that time, McGill had fled on foot and was running down the street. Jones watched appellant chase after McGill, firing the pistol. Two shots struck McGill, one in the lower back and one near the upper arm. The men disappeared from Jones' sight.

By then, all the remaining participants had left the scene. Fortunately, Jones was able to walk to his truck parked nearby and drive the short distance to the police station. He reported the incident and was then taken to the hospital for treatment. Jones testified that no argument or cross words were exchanged prior to the shooting. He also stated that appellant's weapon looked like a .25 caliber automatic pistol.

The testimony of Terrence Williams and Vincent Wilson, who were both eyewitnesses to the shooting, substantiated the events detailed by Jones. Wilson added that he lost approximately $160 to McGill that night. He also stated that he had played the game for four or five hours that night and there had been no arguments or fights. Anthony Webster, appellant's roommate, testified in similar fashion. However, he stated that he and appellant did not arrive on Broadway until after 1:00 a.m. when they both got off work. He further explained that appellant lost $30 in the game and then borrowed money from him, which he also lost. It was then that appellant left and went home. He returned wearing the black clothing. Webster likewise denied that any argument occurred prior to the shooting.

Appellant's uncle by marriage, Vernon Johnson, Sr., also testified for the State. He reported that appellant appeared on his doorstep in the early morning hours of August 4, 1994. Appellant was very nervous and had a silver .25 caliber automatic pistol in his hands. He proceeded to tell Johnson that he had shot McGill and Jones. Appellant then asked Johnson to help him leave town. Johnson first declined, but was afraid for his family's safety and offered to take appellant wherever he needed to go. Johnson then took appellant to Columbia and left him there. He said that en route, they made one stop and appellant disposed of the gun at another person's home.

Law enforcement officials who investigated the crime scene discovered McGill's body on the sidewalk of Broadway Avenue in front of a funeral home, approximately 230 to 240 feet from the place where the shooting began. The body was found facedown on the pavement and the victim was dead when officials arrived. A pair of green shorts, later identified as McGill's, were found next to the body. The pockets contained cigarettes, a lighter, and 32 cents in change. McGill's flip flops were also recovered near the scene of the initial shooting. Bullet casings were found several feet from where the shooting began and one spent casing was also found on the porch of the funeral home. These were identified as having been fired from a .25 caliber firearm and all were fired from the same weapon. The medical examiner reported at trial that McGill died from loss of blood, primarily as a result of the first gunshot wound which pierced his right lung.

Although appellant did not deny shooting the victims, his trial testimony described a somewhat different turn of events. He stated that on August 3, he worked from 3:30 p.m. until 1:00 a.m. at Shipper's Paper Products along with Anthony Webster. After work, someone drove him and Webster to Broadway where he then walked to his house nearby. He changed from his work clothes and put on black shoes, white socks, black shorts, black jacket, black shirt and black toboggan.

Appellant was carrying the weapon with him at this time. He then proceeded to the crap game.

After arriving at the game, he watched for a while and noticed that a lot of cheating was occurring, accomplished by either Jones or McGill "switching the dice." He testified that everyone was losing money to them. He departed the game, went home and procured his own dice. Appellant then returned to participate in the game using his own dice. However, Jones and McGill refused to use his dice and he walked up the street to the corner. After about five minutes, appellant returned to the game to convince Jones and McGill to gamble with his dice. This time they agreed. Appellant stated that he began to win some money. As a result, he claimed that McGill got angry, started cursing him and made derogatory comments about appellant's father. While McGill was "yapping," appellant noticed Jones was reaching around behind his back, which made appellant think Jones had a gun. Jones also commented to the effect that if McGill tried anything he would "watch his back."

Appellant testified that McGill started coming towards him and he was scared. He stated that he pulled out his pistol and just started shooting; he remembers firing five shots. Appellant denied chasing McGill with the gun, saying instead that all the shots were fired in one location. He then ran down the street and ducked into an alleyway because he was afraid Jones was going to run over him with his truck. Appellant insisted that he shot Jones first because he thought Jones was reaching for a gun. He also explained that McGill was well-known as a drug dealer who always carried a gun.

On cross-examination, appellant stated that he took the pistol with him to work that day and carried it in his right front pocket. He denied going home to get the gun, alleging instead that he had it with him throughout the game. He also professed that the gun belonged to Webster. Furthermore, he declared that Webster, Wilson and Williams could not have heard the argument between him and McGill because they were down the street when it happened. He also expressed his belief that Webster did not testify truthfully about the evening's events. Specifically, he repudiated Webster's testimony that he borrowed money from him.

Under continued cross-examination, appellant was unable to explain why the bullet casings were found in different areas. However, he claimed that he shot McGill as he ran away because he was scared and he "just commenced to shooting." In addition, appellant insisted that Johnson was mistaken about him having the gun

when he asked for help because he threw the gun "to a certain person" as he ran from Jones' truck. The State concluded its cross-examination by introducing appellant's previous convictions: four convictions for aggravated robbery and two for attempted aggravated robbery.

The manager of the temporary employment agency for whom appellant worked also testified. She introduced copies of appellant's time records which reflected that on August 3, 1994, appellant worked from 3:30 p.m. until 1:00 a.m. Finally, appellant recalled Anthony Webster to the stand to provide evidence of the victim's reputation for violence. Webster also opined that appellant could not have taken the gun to work with him that day, and that he must have brought it back to the game when he changed clothes.

The jury returned verdicts finding appellant guilty of the first degree premeditated murder of Timothy McGill and the attempted first degree murder of Jesse Tate Jones. It also imposed a $50,000 fine on the attempted murder conviction. Immediately thereafter, a jury sentencing hearing was held for the murder conviction. The State sought life imprisonment of appellant without the possibility of parole. It introduced evidence of two aggravating circumstances: (1) that appellant was previously convicted of one or more felonies involving the use of violence and (2) that the murder was committed during an attempted robbery or attempted murder. See Tenn. Code Ann. § 39- 13-204(i)(2), (7) (Supp.1996). Appellant presented a substantial amount of evidence in mitigation through the testimony of teachers and relatives. Although the jury found that both aggravating factors were supported by the proof, it nevertheless sentenced appellant to life in prison. At a later sentencing hearing on the attempted murder conviction, the trial court sentenced appellant to sixty (60) years as a career offender and ordered that sentence be served consecutively to the life sentence and appellant's previous unserved sentences.

State v. Steve Mason, No. 01C01-9603-CC-00103, 1997 WL 311900, at *1-*4 (Tenn. Crim. App. at Nashville, June 6, 1997) (footnotes omitted). After reviewing the merits of the issues raised by the petitioner in his direct appeal, we affirmed the judgment of the trial court. See id. at *1. The petitioner now appeals the lower court's denial of his petition requesting post-conviction relief, arguing that the post-conviction court erred when it found that the petitioner received effective assistance of counsel and that the petitioner's challenge to the sufficiency of the evidence lacked merit because the issue had been previously determined on direct appeal. After reviewing the record, we find that the petitioner has failed to prove that he is entitled to relief; therefore, we affirm the judgment of the post-conviction court.

## Post-Conviction Standard of Review

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issue raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the court's findings unless the evidence in the record preponderates against them. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn. Crim .App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. See State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

## Sufficiency of the Evidence

The petitioner alleges that the post-conviction court erroneously found that the issue of the sufficiency of the evidence introduced at his trial to support a finding of premeditation and deliberation was an issue that had been previously adjudicated in this Court's disposition of the petitioner's direct appeal. The petitioner relies on Stephen Michael Bell v. State, No. 01C01-9304-CR-00130, 1994 WL 406168 (Tenn. Crim. App. at Nashville, Aug. 4, 1994) in support of his argument that this Court may review the sufficiency of the evidence in a post-conviction appeal.

When discussing the viability of a sufficiency challenge on post-conviction review in Bell, we cited our earlier opinion of John Wayne Slate v. State in which petitioner Slate appealed the sufficiency of the evidence to support his convictions. See John Wayne Slate v. State, No. 03C01-9201-CR-00014, 1994 WL 149170, at *10-*11 (Tenn. Crim. App. at Knoxville, Apr. 27, 1994). In Slate we determined that sufficiency of the evidence could be a valid subject for post-conviction review because it implicated due process concerns. See id. However, if the issue has been waived or previously determined, it is not within the scope of our post-conviction review. See id. at *10-*11. Petitioner Slate challenged the sufficiency of the state's evidence, and we reached the merits of Slate's sufficiency challenge because the issue had not been addressed in Slate's direct appeal. See id. at *5. Conversely, in Bell we found that petitioner Bell's sufficiency challenge was not a proper subject for post-conviction review because the issue had been addressed in Bell's direct appeal. See Stephen Michael Bell, 1994 WL 406168, at *4. Similarly, in the instant case, this Court specifically addressed the sufficiency of the evidence to support a finding of premeditation and deliberation in our review of the petitioner's direct appeal.

> Premeditation and deliberation are determinations for the jury and may be inferred
> from the manner and circumstances of the killing. State v. Bordis, 905 S.W.2d 214,
> 222 (Tenn. Crim. App.1995), perm. to appeal denied (Tenn. 1995) (citation omitted).
> The proof at trial supported these elements.

In evaluating the sufficiency of the evidence, we are compelled to consider the evidence in the light most favorable to the State. Jackson, 443 U.S. at 319. The State's theory of the case, credited by the jury's verdict, was that appellant formed the intent to kill when he lost his money to the victims, which he believed was a result of their cheating. This proof of motive is relevant to an inference of premeditation and deliberation. Bordis, 905 S.W.2d at 222 (quoting 2 W. LaFave and A. Scott, Jr., Substantive Criminal Law § 7.7 (1986)). The State's theory was that appellant decided to murder the victims, went to his home, changed clothes to reduce the likelihood of detection, procured a firearm to accomplish the task, and then returned to the game. Facts about what the appellant did before the killing which show he was engaged in planning activity also support an inference of premeditation and deliberation. Id. See also Brown, 836 S.W.2d at 541 (recognizing that procuring a weapon to commit the homicide is circumstantial evidence of premeditation and deliberation).

Although no quantifiable time is necessary, it is apparent that appellant had ample time to reflect upon the intent to kill. At least twenty minutes passed after he obtained the gun and before he executed the plan. We also find that the killing was committed with a cool purpose. Although the appellant testified that he and McGill exchanged heated words, none of the eyewitnesses testified to such a disagreement. Their testimony reflected that appellant acted wholly without provocation. Moreover, appellant's conduct did not correlate with his theory of self-defense, thus yielding credence to the State's theory. While we cannot infer premeditation and deliberation from appellant's concealment of the weapon after the shooting, concealment does contradict the appellant's theory of self-defense by illustrating fear of detection. West, 844 S.W.2d at 151. Similarly, appellant's efforts to leave town to avoid law enforcement officials is contrary to a theory of self-defense. The jury's guilty verdict discredited appellant's theory and demonstrates the ample evidence supporting a finding of premeditation and deliberation. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Steve Mason, 1997 WL 311900, at *7. Because we specifically addressed the issue now raised in the petitioner's post-conviction appeal, the sufficiency of the evidence to support a finding that the petitioner acted with premeditation and deliberation, this issue has been previously determined. Accordingly, we will not revisit this issue unless our finding was clearly erroneous. See State v. Delk, 692 S.W.2d 431, 438 (Tenn. Crim. App. 1997); Darnell Gentry v. State, No. 02C01-9604-CC-00115, 1997 WL 195473, at *1 (Tenn. Crim. App. at Jackson, Apr. 23, 1997) (citing Delk for same proposition).

Our finding is not clearly erroneous and is supported by the record. The evidence, viewed in the light most favorable to the state, establishes that the petitioner lost money while gambling with the victims and then went home, changed into dark clothing, procured a weapon, and returned to the game in order to shoot the victims who were the proprietors of the gambling enterprise. We find that

these facts, which have been incorporated into our thorough review of the issue in our disposition of the petitioner's direct appeal, amply support a finding that the petitioner acted with premeditation and after deliberation. Thus, we will not disturb our finding, and this issue is not a cognizable claim for post-conviction review.

## Effectiveness of Assistance of Counsel

The petitioner also challenges the effectiveness of the assistance provided by his trial counsel. The petitioner alleges that his counsel's pre-trial statements to the trial court reflect both an inability to zealously represent him and a resulting inherent conflict of interest. When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. See Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See Strickland v. Washington, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." Henley, 960 S.W.2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. See id. at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. Burns, 6 S.W.3d at 461.

In his argument of this issue, the petitioner cites a portion of the record in which his trial counsel requested that she be allowed to withdraw from her representation of the petitioner, citing his unwillingness to accept her legal advice as the basis for a dysfunctional working relationship. The petitioner then argues that counsel's comments reflect her inability to zealously represent him and that her feelings towards him ultimately resulted in a conflict of interest, namely a conflict with her duty to the petitioner, i.e. "to act in [his] best interests."

We first note that while the petitioner cites to a portion of the record reflecting his counsel's pre-trial request to withdraw her representation, the petitioner does not allege how his counsel performed deficiently or how, but for her deficient performance, the result of his trial would have been different. See Strickland, 466 U.S. at 694; Baxter, 523 S.W.2d at 936. Accordingly, the defendant has failed to meet the required burden for a grant of post-conviction relief. See Henley, 960 S.W.2d at 580.

Moreover, while the petitioner alleges that his counsel's remarks indicate that she had a conflict of interest with regard to her representation of him, he has failed to prove that his counsel was "actively representing divergent interests." Cuyler v. Sullivan, 446 U.S. 335, 348-50 (1980) (holding that an accused must establish that his or her counsel was "actively representing divergent interests," that the conflict was actual, not hypothetical, and that the conflict of interest "adversely affected his [or her] lawyer's performance" in order to establish a constitutional deprivation). While counsel announced that she would find a working relationship with the petitioner difficult based on his refusal to accept her legal advice, nothing in the record demonstrates that counsel abandoned her duty to zealously represent the petitioner during his trial. Without such a showing, the petitioner is not entitled to an assumption that he was prejudiced by his counsel's representation. See id.

Thus, because the petitioner has failed to demonstrate prejudice and because this case does not warrant an assumption of prejudice, we find that the petitioner's allegation that he received ineffective assistance of counsel lacks merit.

### Conclusion

For the foregoing reasons, we find that none of the petitioner's allegations merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE