IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 5, 2016

## STATE OF TENNESSEE v. TRAVIS SEIBER

**Appeal from the Criminal Court for Shelby County**
**No. 1300594     W. Mark Ward, Judge**

─────────────────────

**No. W2015-00221-CCA-R3-CD  -  Filed February 23, 2016**

─────────────────────

Aggrieved of his Shelby County Criminal Court jury convictions of three counts of aggravated robbery, the defendant, Travis Seiber, appeals, arguing that he was deprived of the right to a trial by a fair and impartial jury, that the trial court erred by permitting the State to use as a demonstrative aid a gun that had not been entered into evidence, and that the evidence was insufficient to support his convictions.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Mitchell Wood, Memphis, Tennessee, for the appellant, Travis Seiber.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Shelby County Criminal Court jury convicted the defendant of three counts of aggravated robbery for his role in the August 24, 2012 taking of money and cellular telephones from Jose Escobar, Juan Camacho, and Ofelia Romero at gunpoint.

At trial, Mr. Escobar testified that he and the other victims worked cleaning restaurants from 10:00 p.m. to 2:00 a.m. each evening.  Mr. Escobar always parked his car at the Bella Vista Apartment complex, where Mr. Camacho and Ms. Romero lived together, and the three would ride to work together.  The victims returned from work shortly before 3:00 a.m. on August 24, 2012.  As they stood in the parking lot, they were

approached by a man holding a firearm. A second man using a shirt to cover his face also approached from a nearby breezeway. The man "pointed the gun on [Mr. Camacho's] head" and took cellular telephones and money from Mr. Camacho and Ms. Romero. The man with his face covered took Mr. Escobar's wallet, cellular telephone, and $77. The perpetrators ran away through the parking lot.

Mr. Escobar identified the defendant as the perpetrator who pointed the black handgun at Mr. Camacho, noting that the parking lot "was very illuminated. You could see very well" and that the defendant had a distinctive scar on his face as well as long dreadlocks in his hair. He also noted that he had previously seen the defendant in the parking lot of the Bella Vista Apartments. Mr. Escobar later identified the defendant from a photographic array.

Mr. Escobar said that he quit his job working for Mr. Camacho one week after the robbery because he was afraid. Mr. Camacho and Ms. Romero, he said, moved to New Orleans shortly after the robbery because they were afraid.

Memphis Police Department ("MPD") Officer Joshua Barnes, who responded to the call reporting the robbery, testified that he prepared a report based on the information he "could comprehend from [Mr. Camacho's] very broken English and [Officer Barnes's] very broken Spanish." He gleaned that the victims had been robbed at gunpoint.

MPD Officer Fausto Frias testified that he was dispatched to take statements from the victims a few days after the robbery because neither Mr. Escobar nor Ms. Romero spoke any English and Mr. Camacho's English was poor. Both Mr. Escobar and Mr. Camacho identified the defendant as the armed assailant. Neither man could identify the assailant whose face remained covered during the robbery, and Ms. Romero made no identifications at all. Officer Frias also interviewed the defendant following his arrest. He recalled that the defendant insisted that he had not committed the offenses but did not provide any alibi information during his interview.

Tammy McKinley testified on behalf of the defendant that the defendant came to visit her at the Peppertree apartment belonging to Ms. McKinley's sister at around 8:00 a.m. on the morning of August 24, 2012. She said that she recalled the date because she was preparing for her grandson's birthday party. She said that the defendant did not leave the apartment until he went with her to the party on the evening of August 25, 2012.

Iesha Lacy, Ms. McKinley's daughter, testified that she was living in the Peppertree Apartments in August 2012, when the defendant came there to visit Ms.

McKinley.  She said that the defendant arrived on the evening of August 23, 2012, and stayed until August 25, 2012, when they left to attend her son's birthday party.

Based on this proof, the jury convicted the defendant as charged of three counts of aggravated robbery.  Following a sentencing hearing, the trial court imposed three sentences of 10 years each to be served at 85 percent by operation of law for each conviction and ordered partially consecutive sentencing for a total effective sentence of 20 years at 85 percent.

In this timely appeal, the defendant asserts that he was deprived of the right to a trial by a fair and impartial jury, that the trial court erred by permitting the State to use as a demonstrative aid an imitation gun that had not been entered into evidence, and that the evidence was insufficient to support his convictions.  We consider each claim in turn.

*I.  Juror Bias*

The defendant asserts that he was deprived of the right to trial by a fair and impartial jury because one of the jurors knew the defendant and his family prior to trial and failed to disclose his knowledge during voir dire.  The State contends that the defendant has failed to prove any bias on the part of any juror.

The criminal accused possesses the right to trial by an impartial jury as guaranteed by the state and federal constitutions.  *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); Tenn. Const. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to . . . a speedy public trial, by an impartial jury of the county in which the crime shall have been committed . . . .").  To this end, "[a] court may discharge from service a . . . petit juror . . . who is disqualified from such service, or for any other reasonable or proper cause, to be judged by the court," including "[t]hat a state of mind exists on the juror's part that will prevent the juror from acting impartially."  T.C.A. § 22-1-105.  Generally, juror disqualifications are based upon one of two theories:  (1) *propter defectum* ("On account of or for some defect."  *Black's Law Dictionary* 1385 (Rev. 4th Ed. 1968)) or (2) *propter affectum* ("For or on account of some affection or prejudice."  *Id.*).  Because the defendant complains of bias or partiality against the defendant, his claim is one of *propter affectum*.  *See State v. Furlough*, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990).

At the hearing on the defendant's motion for new trial, the defendant's father and brother, James Seiber III and James Seiber IV, testified that on the last day of the defendant's trial juror Fred Marshall spoke to them in the men's restroom.

-3-

Mr. Seiber IV recalled that Juror Marshall told them good morning and that, after he had washed his hands, Juror Marshall told them to have a good day. He said that after the encounter, Mr. Seiber III said that he thought he recognized the juror. At that point, Mr. Seiber IV said, that he "remembered that [he] knew" Juror Marshall. After the trial, he "went and researched and found out who [the juror] was" because he "did not know who Fred was at the beginning of this trial." He said, "I didn't know him or remember him at that point." Mr. Seiber IV testified that he had dated Juror Marshall's daughter "[p]robably about maybe about 20 years ago" when the two were in high school and that the relationship ended when she discovered Mr. Seiber IV's infidelity and slashed the tires on his car in retribution. Mr. Seiber IV said that Juror Marshall had refused to pay for the replacement of the slashed tires and that he had ordered Mr. Seiber IV to stay off of his property.

During cross-examination, Mr. Seiber IV said that initially he was not sure that Juror Marshall was the same man he had known previously because he "hadn't seen him in over 20 years . . . . So his facial wasn't the same." Mr. Seiber IV insisted, however, that with the exception of his hairstyle, his own appearance was exactly the same as it had been 20 years prior. He insisted that if he had remembered Juror Marshall, he "would of said something at the beginning of the trial." Mr. Seiber IV conceded that Juror Marshall said nothing beyond "good morning" and "y'all have a good day," but he insisted that Juror Marshall "engaged in the conversation to almost like I know you or something like that."

Mr. Seiber III testified that he "[b]arely" recognized one of the jurors who sat "on the end" in the jury box. He said, "I didn't know him. I thought I knew him but after we went in the restroom it became clear to me that I knew this guy." He said that he remembered the juror because he had seen him in the grocery store on one occasion and passing by in his car. Mr. Seiber III said that he was aware that Mr. Seiber IV "used to date [the juror's] daughter. But I didn't know him that well. Her either." During cross-examination, he acknowledged, "I did not have a relationship with [Juror Marshall], sir. I barely knew the man."

The court denied the defendant's motion for new trial, ruling with respect to the juror bias issue as follows:

> As far as the efforts here to impeach this verdict, . . . I find that what we basically have here is that there's one juror, Juror Number 1, that 20-something years ago lived three or four houses down from the defendant's family. And his brother some 20-something years ago dated [the juror's

-4-

daughter] for a little while and . . . they had a conflict.

Of course this is 20-something years ago. And your first witness here today said I didn't recognize him. I didn't remember him. And the same way with the defendant's father, James Seiber III. He didn't remember him until they spoke in the bathroom. So I think it's probably just as likely that the juror didn't remember them either. I certainly don't have any proof here today that the juror remembered them. And but be that as it may. And the other thing I want to say is this has been presented to me from the perspective that this juror knowing the defendant's brother and the defendant's father. It hasn't been presented to me from the perspective of knowing the defendant who is on trial. The defendant sits here and remains mute, silent. He sat through the whole trial. Am I to infer that the defendant didn't remember him either? Or he did remember him? I don't know. He hasn't testified here today. But this is about the defendant, not the defendant's brother or the defendant's family. So I don't have, Number 1, any evidence of any extraneous prejudice or any information or outside influence given to this jury. A few comments were made that were innocuous in the bathroom. It had nothing to do with this case.

Number 2, I have no evidence that this juror lied on voir dire or knowingly failed to disclose material information. It's just as likely that – well, I have absolutely no evidence that he knows the defendant, but it's just as likely that he didn't remember the brother or the father either. But I don't have any evidence. I don't have any evidence of any bias or partiality on the part of this juror. All of the jurors said that they could be impartial. I don't have anything to refute that.

I'm willing to bet the transcript shows me asking the jurors if they knew the defendant. I don't have any evidence he did remember the defendant. So anyway I just don't think there's any reason to impeach the verdict under these circumstances.

The defendant complains that the trial court should have granted him a new trial because Mr. Seiber IV had dated Juror Marshall's daughter some 20 years prior to

the trial, and the relationship had ended on bad terms. He claims entitlement to a new trial on grounds that Juror Marshall intentionally failed to disclose this information during voir dire and that Juror Marshall was prejudiced against him.

The Supreme Court has observed that "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved" in a trial. *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). Instead, "'[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Id.* at 800. The defendant must "demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Id.*

Here, the record does not clearly establish that Juror Marshall actually knew and recognized the defendant, let alone that he had any prejudice against the defendant. The defendant would have this court assume, based on the testimony of the defendant's father and brother, that Juror Marshall recognized them, even though both testified that they did not initially recognize Juror Marshall, that Juror Marshall knew that Mr. Seiber III and Mr. Seiber IV were related to the defendant, that Juror Marshall recalled Mr. Seiber IV's dating his daughter 20 years before the trial, and that Juror Marshall decided to exact revenge for Mr. Seiber IV's 20-year-old slight against his daughter by convincing the other jurors to convict the defendant of robbery based on this extraneous information. To say that this is nothing more than rank speculation is an understatement. No proof exists of "'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 800. In consequence, the defendant is not entitled to relief on this issue.

## II. Demonstrative Aid

The defendant next asserts that the trial court erred by permitting the State to use a plastic handgun as a demonstrative aid during closing argument, arguing that because no gun was recovered and Mr. Escobar could not describe the gun beyond its being a "black handgun," the plastic gun was not relevant. The State contends that because the prosecutor only used the gun to demonstrate the distance from which Mr. Escobar observed it during the robbery, it was relevant to the presentation of the State's case.

Following the presentation of the proof, the prosecutor indicated to the court and to the defendant his intent to use a plastic handgun during his closing argument to demonstrate for the jury the distance between Mr. Escobar and the defendant during the offense to reiterate that Mr. Escobar was close enough to identify the defendant and observe the gun used during the crime. The defendant objected, arguing that because no gun had been recovered and Mr. Escobar could not describe the gun beyond its being a

-6-

"black handgun," the plastic handgun was not relevant. The trial court ruled that the prosecutor would be permitted to use the plastic handgun as a demonstrative aid so long as he made it clear to the jury that the gun was not the one involved in the robberies. Just before the prosecutor began the demonstration, the trial court admonished the jury, "Just for demonstration purposes we got a little rubber gun here. And this is not, no one is trying to argue this was the gun involved and the thing is just for demonstration."

The decision whether to permit the use of demonstrative aids rests generally within the discretion of the trial judge. *See, e.g.*, *State v. West*, 767 S.W.2d 387, 402 (Tenn. 1989); *State v. Delk*, 692 S.W.2d 431 (Tenn. Crim. App. 1985). Demonstrative aids may be used during the trial or during closing argument, when their use is governed by the same general rules for the propriety of closing argument. Trial courts have substantial discretionary authority in determining the propriety of final argument but must be careful to restrict any improper argument. *Sparks v. State*, 563 S.W.2d 564, 569–70 (Tenn. Crim. App. 1978). Generally speaking, closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). The State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *State v. Gann*, 251 S.W.3d 446, 459-60 (Tenn. Crim. App. 2007). "To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict." *Id.* (citing *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). In *Judge v. State*, this court articulated the factors to be considered in making that determination:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
> (3) [t]he intent of the prosecutor in making the improper statements[;]
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
> (5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Here, the prosecutor informed the court and the defendant prior to the beginning of closing argument of his intent to use the plastic handgun as a demonstrative aid. He allowed the court, the court officer, and defense counsel to examine the gun, and the court heard the defendant's arguments against its use during closing argument. Ultimately, the court concluded that the prosecutor would be permitted to use the gun to

demonstrate the distance between the defendant and the victims during the offense. That distance was critical to the State's case, which case hinged upon Mr. Escobar's identification of the defendant as the perpetrator and his testimony that the defendant used a gun. Mr. Escobar's ability to view the defendant and the gun was crucial to his testimony. Additionally, the plastic gun was a "black handgun" as was described by Mr. Escobar, and both the court and the prosecutor made it clear to the jury that the gun was not the one used in the offense. Under these circumstances, we cannot say that the trial court abused its discretion by permitting the prosecutor to use the plastic handgun as a demonstrative aid.

### III. Sufficiency

Finally, the defendant contends that the evidence was insufficient to support his convictions of aggravated robbery, arguing that because neither Mr. Camacho nor Ms. Romero testified at trial, there was no evidence that the defendant took their property by fear.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the

person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). A deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5).

As indicated, simple robbery, and aggravated robbery by extension, may be accomplished by either violence or putting the victim in fear. *See id.* § 39-14-401(a); -402(a). The evidence adduced at trial established that the defendant and another man approached the victims in the parking lot of the Bella Vista Apartments shortly before 3:00 a.m. Mr. Escobar testified that the defendant, whom he was able to identify because of the distinctive scar on his face and his unusual hairstyle, pointed a black gun at Mr. Camacho before the defendant and another man, who kept his face covered, took money and cellular telephones from the victims. Both Mr. Escobar and Mr. Camacho identified the defendant as the gun wielding perpetrator from a photographic array. "[P]ointing a deadly weapon at the victim constitutes 'violence' as used in the offense of robbery pursuant to Tenn[essee] Code Ann[otated] § 39-13-401." *State v. Allen*, 69 S.W.3d 181, 185 (Tenn. 2002). Additionally, Mr. Escobar testified that he gave the perpetrators his money and cellular telephone because he feared the defendant would shoot Mr. Camacho. The other victims gave their property to the perpetrators at gunpoint, and their leaving town shortly after the offenses circumstantially established that the taking was accomplished by putting them in fear. Consequently, the evidence more than sufficiently establishes the elements of aggravated robbery.

*Conclusion*

Based upon the foregoing, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE