IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 2, 2004 Session

## STATE OF TENNESSEE v. JASON C. POLSTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-08299     Bernie Weinman, Judge**

_____

**No. W2003-02556-CCA-R3-CD  - Filed August 19, 2004**

_____

A Shelby County jury convicted the Defendant, Jason C. Polston, of reckless aggravated assault. The trial court sentenced the Defendant to two years in the workhouse, suspended except for 60 days to serve on weekends, a $500.00 fine, and 200 hours of community service.  On appeal, the Defendant contends that: (1) insufficient evidence exists to support his conviction; (2) the trial court erred by failing to suppress the Defendant's statement made in a telephone conversation with a police officer because the State did not disclose the statement prior to trial; (3) the trial court erred by instructing the jury on flight; (4) the trial court erred by failing to charge the defenses of necessity and duress; (5) the trial court erred by denying the Defendant's application for judicial diversion; and (6) the trial court erred by ordering the Defendant to serve sixty days in jail.  We conclude that the trial court erred by failing to suppress the Defendant's telephone conversation with a police officer because the State did not disclose the statement to the Defendant prior to trial in violation of Tennessee Rule of Criminal Procedure 16.  Therefore, we reverse the Defendant's conviction and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed; and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Robert Brannon (at trial and on appeal) and Timothy Francavella (at trial), Memphis, Tennessee, for the appellant, Jason C. Polston.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; Emily Campbell and Michael Davis, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**
**I.  Facts**

The Shelby County Grand Jury indicted the Defendant for aggravated assault after he hit a man on the dance floor of a Memphis bar on September 7, 2002. A jury convicted the Defendant of reckless aggravated assault, and the trial court subsequently sentenced the Defendant to two years in the workhouse, a $500.00 fine, and 200 hours of community service. The trial court suspended the sentence, except for sixty days to be served on weekends.

## A. Trial

The following evidence was presented at the Defendant's trial. John Blondin, the victim, testified that he is a chief sonar technician with the United States Navy currently living in San Diego, California. The victim testified that he was captain of the Navy volleyball team, which had chosen Millington Naval Base near Memphis as its training camp. He said that, on September 6, 2002, he and several other members of the team went out after the last day of practice. The victim, 42, stated that he went because he felt an obligation "to baby-sit some of my younger players." He testified that he is 5'10" and normally weighs 145 pounds.

The victim said that the group first went to Champions, a bar in Memphis, where he consumed two drinks. The victim stated that the group, which consisted of five team members and three guests, next went to a bar called Flashbacks in a van driven by a designated driver. The victim stated that they went into Flashbacks, walked to the bar area, and picked a table. He said that several people started dancing and that he could not remember anything else that occurred that evening because of the post-concussion syndrome caused by a head injury he sustained that night. The victim said that the last thing that he remembered was sitting at a table in Flashbacks and seeing team members Tim Kraus and Brian Rosemark on the dance floor.

The victim testified that, because of his fractured skull, he suffered a temporary loss of smell and permanent hearing loss in his left ear. He stated that the hearing disability could disqualify him from certification for sea duty. He said that he had experienced painful headaches, including one that prompted a trip to the emergency room, but most of the headaches had gone away a few weeks after the incident. The victim stated that his sight and motor skills were "pretty much back to normal." He testified that his hearing had been checked every year since 1983 as part of standard procedure, and poor test results would prevent him from serving as a sonar operator.

On cross-examination, the victim said that the team had incentive to avoid incidents because the Navy was cutting similar discretionary activities. He stated that he went out on the night of the incident because he felt a responsibility as the oldest member of the team. He testified that Kraus, who was his friend, was approximately 6'5" tall and 280 pounds on the night of the incident. The victim testified that, on the night of the incident, he went with Lieutenant Rosemark and another individual to purchase alcohol at a nearby liquor store. He stated that the five team members were male, and the three guests were female. He said that he purchased drinks for himself and others. He stated that he did not remember what drinks, if any, others purchased. The victim said that he ate some chicken tenders while at Champions. He testified that, if the subsequent Navy investigation determined that the incident was within the line of duty, then the Navy would still cover his benefits.

He conceded that being intoxicated and then being part of an altercation might "demean the Navy" and thus result in punishment.

Kathleen Schoettle testified that she is a military police officer stationed at Millington Naval Base in Shelby County. She stated that her roommate was organizing events for the volleyball team, and they both accompanied the team to Champions and Flashbacks on the night of the incident. She said that, at Flashbacks, the victim and Tim Kraus danced over on the far side of the dance floor while she stayed on the other side. Schoettle testified that Kraus and a blonde woman collided into each other, and Schoettle did not know who was at fault. She said that she was standing five feet away when the two exchanged words. She stated that Kraus turned away, and the victim turned toward the Defendant, putting his hands up in an "it's okay" gesture. She said that the victim turned away, and the Defendant then struck the victim's face. Schoettle testified that the Defendant "didn't waste much time in the area" and calmly walked out of the building. She said that the victim, who was bleeding, "bounced on the ground" once or twice without standing back up, and he did not go after the Defendant. She stated that another friend wrote down the license plate number of the Defendant's Land Rover. She said that the victim had not made any aggressive moves toward the Defendant before the Defendant struck him.

On cross-examination, Schoettle testified that she was not wearing her uniform when they were in the bar. She said that the dance floor was "dimly lit," and a strobe light was operating. She stated that she had planned to meet her boyfriend at the club. Schoettle said that she could not recall the respective ranks of the volleyball team members. She testified that she had consumed one beer, and she did not know how much alcohol that the victim consumed. She conceded that she had not discussed the victim's hand gesture in three earlier interviews with military and police investigators. She denied that she was told to testify that the victim made a hand gesture. Schoettle said that she did not drink any of the purchased alcohol because she did not like hard liquors. She stated that the area of Flashbacks occupied by the military personnel was not very congested.

On re-direct examination, Schoettle testified that the group had been at Flashbacks for about ten minutes before the incident occurred. Reading from a previous statement, she identified the aggressor as having "light brown hair and blue eyes, approximately five-nine to five-eleven [feet tall], 180 to 190 [pounds]." She said that the entire incident happened within thirty seconds. On re-cross examination, she testified that the victim was not facing the Defendant at the time Kraus bumped into the blonde woman.

Dr. Shelly Timmons, a neurological surgeon, testified that she worked at several Memphis-area hospitals. She stated that the victim had been admitted to the hospital with a head injury and had an abnormal CAT[1] scan. Dr. Timmons testified that the victim had a fracture on the back, left-hand side of his head, and he had some bruising in the right side, temple area of his brain. She stated that he had bleeding along the surface of the brain, and his behavior and neurological examination

---

[1]Computerized axial tomography.

were consistent with a concussion. She said that the victim was "very confused" and drifted in and out of sleep. She stated that subsequent CAT scans revealed additional bleeding, as was common for this type of injury. Dr. Timmons said that, in a subsequent examination of the victim, he complained of hearing difficulties and headaches. She stated that the loss of hearing could be a side effect of a head injury.

On cross-examination, Dr. Timmons stated that she had no prior relationship with the Navy, and her treatment of the victim resulted solely from an emergency room referral. She said that the victim's blood alcohol level was 0.104. She stated that medical reports showed that the victim lost consciousness before reaching her at the hospital, and the medical reports also indicated that he smelled strongly of alcohol.

Dr. Timmons reported that the victim told her about a gas embolism that he suffered from a Navy diving test. The doctor said that the victim informed her that he had to be placed back in a decompression chamber because of nitrogen bubbles in his blood caused by a rapid pressure change. She believed that, although the question was outside her area of expertise, a person could suffer hearing loss from a rapid decompression. She said that she did not have a record for when his decompression incident occurred. She stated that, because the victim lived in another state, she saw him only one time after he left the hospital. She said that she communicated with the victim over the telephone and sent him for a follow-up CAT scan.

Dr. Timmons testified that another doctor performed an MRI[2] on the victim and found that the victim suffered from brain damage as a result of either the trauma of the fall or an unrelated event, such as disease or a systemic disorder. She said that the victim's injuries were similar to those one could sustain in an automobile accident. She stated that the findings did not support any particular mechanism for what injured the victim. She said that, other than the head trauma, the victim had an abrasion to his lip and had sustained little other facial trauma.

Lasondra Price, an officer with the Memphis Police Department, testified that she received a September 7, 2002, call to respond to an incident at Flashbacks. She said that an ambulance transported the victim to the hospital as she interviewed witnesses. She stated that a witness gave her the tag number of someone who had left the scene, and a vehicle check revealed that the car, a Land Rover Discovery, was registered to the Defendant.

On cross-examination, Officer Price said that she interviewed Schoettle, who said that the Defendant and Kraus exchanged words. The officer acknowledged that Schoettle said that the victim began to mediate between the two. Officer Price conceded that Schoettle made no reference to the victim's "placing his hands up." The officer stated that she did not know whether Schoettle had been drinking. Officer Price reported that Schoettle said that the Defendant hit the victim "straight in the face."

---

[2]Magnetic resonance imaging.

Jerry Max Newman testified that he had been an officer with the Memphis Police Department for fifteen years and responded to a September 7, 2002, incident at Flashbacks. He stated that, when he arrived, he saw the victim lying unconscious and non-responsive on the floor. The officer stated that, after questioning witnesses, he suspected a white male "of medium height and weight, who fled the scene after the incident." The officer said that he interviewed Schoettle and Kraus at Flashbacks. Officer Newman said that he and other officers ran a vehicle check on the Defendant at 1:30 a.m. to learn his address.

Paul Wright, Jr., testified that he was an officer with the Memphis Police Department for more than fourteen years, and, at the time of the incident, he was an investigator with the general assignment bureau. He said that he was assigned the case on September 8, 2002. Detective Wright said that he was unable to talk to the victim because of the victim's injuries. The detective said that witnesses Schoettle and Kraus identified the Defendant in a photo spread. Detective Wright stated that he sent a contact letter to the Defendant after being unable to contact him at his address. The detective said that he never took a formal statement from the Defendant, and the Defendant never visited the police station.

The victim again testified and said that the Navy tests its sonar personnel to determine if they can withstand one-and-one-half atmospheres of pressure. The victim stated that he had a headache after his 1986 test, so he went back into the chamber for another four hours. The medical personnel suspected that he had "bends," which is a cerebral gas embolism resulting from the bubbling of nitrogen in the blood. The victim said that the medical personnel neutralized the embolism, and his subsequent physicals and annual audiograms read normally. On cross-examination, the victim stated that this was his only experience with the gas-pressure chamber.

The Defendant called Amanda Lyles, who testified that she was with the Defendant and his wife on the evening of September 6, 2002. She said that the trio had dinner at Stonewall's restaurant, where she consumed two beers, before proceeding to Flashbacks. Lyles stated that they remained at Flashbacks for approximately one hour. She recounted that she was on the dance floor with the Defendant's wife, Alicia Polston, when she noticed one man "very, very tall in stature," and the victim. Lyles stated that, later, while she was on the dance floor with the Defendant, the tall man bumped into her twice. She said that, after the third collision, he "had a very mean look on his face," and he started yelling at her. Lyles testified that she then wanted to leave the dance floor, and she noticed that the victim approached the Defendant. She said that the victim's hands were going into the Defendant's chest. She said that she then walked over to Alicia Polston, and both left the facility.

On cross-examination, Lyles conceded that she did not see the Defendant hit the victim. She acknowledged that the dance floor was crowded. Lyles said that the Defendant exited Flashbacks before she and Alicia Polston did. She stated that they left because of concerns that the military men would come after them. She said that she was scared when the victim walked up to the Defendant and moved his lips with an angry facial expression. She stated that she did not see the victim lying on the floor. Lyles testified that she did not see any visible injuries on the Defendant, and, emotionally, he seemed "in shock and surprise." She stated that the Defendant entered the car first.

She said that, once they were in the car after leaving Flashbacks, she believed that the Defendant had hit the victim.

Alicia Polston testified that she, Lyles, and the Defendant went to Stonewall's restaurant, where she consumed a beer. She stated that the trio then went to Flashbacks, where they noticed several other people on the dance floor including the victim and a man approximately 6'5" tall. She said that both were acting "kind of goofy and horse-playing on the dance floor." She stated that she had not seen the tall man since the incident. Alicia Polston testified that she sat down at a table while Lyles and the Defendant danced. She said that the tall man bumped into Lyles several times before the man turned and said something to Lyles. Alicia Polston stated that the victim then approached the Defendant and yelled at him very close to his face. She said that, at the same moment when the victim attempted to head-butt the Defendant, the Defendant raised his hands, but she did not see any contact between the Defendant's hands and the victim's head. She stated that she, the Defendant, and Lyles were scared and left soon after the incident on the dance floor.

On cross-examination, Alicia Polston said that she loved her husband and did not want him to go to jail. She stated that she had a second beer at Flashbacks, and she did not finish it. She said that the Defendant also ordered a beer at Flashbacks, and she believed that he did not finish it. She testified that the Defendant's hands rose as a defensive reflex to the impending head-butt by the victim. Alicia Polston stated that she did not see the victim lying on the floor. She said that her husband had a "large knot on his forehead the next day," but they did not report the injury to a doctor or law enforcement officials. On redirect examination, she testified that the Defendant had consumed one beer at dinner in addition to the one that he ordered at Flashbacks. She said that she and the Defendant were leaving the state the next day because the Defendant's job had transferred him to Denver, Colorado.

The Defendant testified that he went to dinner with Alicia Polston and Lyles between 7:30 and 8:00 p.m., and then they went to Flashbacks approximately two hours later. He said that he did not see the altercation between Lyles and Kraus, but, after it happened, the victim approached the Defendant and said, "You better keep your girlfriend away from me." He explained that the victim headed-butted him on the dance floor. The Defendant stated that, when the victim head-butted and pushed him, he responded with a "simple reaction" that "grazed" the victim. He testified that he believed he was acting in self defense when he struck the victim. The Defendant recounted that he did not see the victim fall. The Defendant stated that he had never been in trouble with the law prior to this incident, and he currently held a job. He said that, upon learning of the charges against him, he returned to the state and turned himself in without a lawyer.

On cross-examination, the Defendant conceded that he did not contact security or law enforcement officers after the incident. The Defendant explained that he was scared of the large man and left quickly. He conceded that he left the building without making sure that Alicia Polston and Lyles were safe. The Defendant stated that, in the car, he expressed surprise over the victim's head-butt. The Defendant said that he learned of his arrest warrant through a letter received by his mother-in-law. The Defendant testified that he contacted Detective Wright about the letter's meaning. The

Defendant said that he did not inform the officer that he had been acting in self defense. On redirect examination, the Defendant stated that the victim struck at him first.

Detective Wright again testified and said that he sent the Defendant a letter that identified the Defendant as a suspect in a crime. Detective Wright stated that a man identifying himself as the Defendant called October 6, 2002. Over the Defendant's objection, the detective testified that the Defendant denied being at Flashbacks for the past two years. The detective testified that the Defendant said, "Hey me? Me, be involved in a crime? No, you got the wrong man. Not me, you know, I haven't even been to Flashbacks in two years." The detective said that his testimony concerning these statements of the Defendant was based on his independent recollection of the conversation. Detective Wright stated that he told the Defendant to contact a lawyer.

On cross-examination, the detective stated that he probably has ten active cases at any given time. He stated that, during the conversation with the Defendant, he typed his notes of the telephone conversation into the computer. The detective said that he only typed an understanding of what the Defendant said, and he used it as a summary for his recollection. Detective Wright estimated that he had worked with approximately one hundred cases since the conversation with the Defendant. The detective stated that he had already submitted the case to the grand jury when he spoke to the Defendant. Detective Wright said the Defendant was informed that he was a suspect in an assault, and the Defendant was not read his Miranda rights.

Following the presentation of the evidence and closing arguments, the jury convicted the Defendant of reckless aggravated assault.

## B. Sentencing Hearing

At the sentencing hearing, the Defendant called Darlene Rene Scoggins to testify. She stated that she has known the Defendant for twenty-six years, dating back to when he was two years old. She described the Defendant as "a very good kid" who has always been a role model to her children. She opined that he has a "very good character . . . just a very mannerly guy." She believed that the Defendant would have no problems with probation or any other alternative sentencing ordered, and he would continue to work in and contribute to society. Scoggins said that, following his parents' divorce, the Defendant helped raise his younger sisters.

Menyan Jacqueline Harrell testified that she had known the Defendant and his family for fifteen years. She said that learning of the incident had left her stunned because the Defendant has always been "a very quiet, polite, perhaps the most non-violent child that I have ever known." She believed that the Defendant could comply with any alternative sentencing arrangements. On cross-examination, she said that learning of the assault surprised her.

Zina Wooten, the Defendant's mother, testified that the Defendant was a good student who helped raise his sisters following her divorce from his father. She stated that, in high school, the Defendant participated in sports and community service. Wooten said that she doubted that the

Defendant would ever be in a similar situation again and believed that he could comply with alternative sentencing.

The Defendant testified that he was employed with a Jeep Chrysler dealership in Hendersonville. He stated that he grew up in Bartlett, went to Ellendale Elementary, then Bolton High School, and graduated from the University of Memphis. He said that, although he felt differently in his heart, he accepted the jury's verdict. He stated that he would be able to fulfill any requirements imposed for alternative sentencing. The Defendant expressed concern at his ability to obtain employment and perform community service with a criminal conviction. On cross-examination, the Defendant acknowledged that he placed himself in the circumstances that resulted in his conviction. He expressed remorse for the victim's injuries and wished he could say that to the victim. He said that his employers knew of his felony conviction and did not intend to fire him. The Defendant requested that the court apply mitigating factors (1), (2), (3), (7), (8), (11), and (12) under Tennessee Code Annotated section 40-35-113 (1997 & Supp. 2002). The Defendant also asked for diversion instead of a jail sentence, and the State contested this request.

The trial court sentenced the Defendant to two years in the Shelby County Workhouse and imposed a fine of $500.00. The trial court ordered the Defendant to serve sixty days on weekends, and suspended the balance of the workhouse sentence. The trial court also ordered the Defendant to perform 200 hours of community service.

## II. Analysis

On appeal, the Defendant contends that: (1) insufficient evidence exists to support his conviction; (2) the trial court erred by failing to suppress the Defendant's telephone conversation with a police officer because the State did not disclose the statement prior to trial; (3) the trial court erred by instructing the jury on flight; (4) the trial court erred by failing to charge the defenses of necessity and duress; (5) the trial court erred by denying the Defendant's application for judicial diversion; and (6) the trial court erred by ordering the Defendant to serve sixty days in jail.

### A. Sufficiency of the Evidence

The Defendant argues that the evidence presented at trial was insufficient for a rational trier of fact to find him guilty of reckless aggravated assault beyond a reasonable doubt. When an accused challenges the sufficiency of the evidence, our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate

the evidence.  State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  Buggs, 995 S.W.2d at 105; Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956).  Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence.  State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

A person commits aggravated assault who "[r]ecklessly commits an assault as defined in § 39-13-101(a)(1), and . . . [c]auses serious bodily injury to another. . . ."  Tenn. Code Ann. § 39-13-102(a)(2)(A) (1997 & Supp. 2002).  A person commits assault who "[i]ntentionally, knowingly or recklessly causes bodily injury to another. . . ."  Tenn. Code Ann. § 39-13-101(a)(1) (1997 & Supp. 2002).  "Serious bodily injury" means bodily injury which involves: a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34) (1997).

The Defendant argues that insufficient evidence exists to support his conviction of reckless aggravated assault because "no rational trier of fact could have found that [the Defendant] *caused* the serious bodily injury to [the victim] beyond a reasonable doubt."  We cannot agree with the Defendant's assertion.  Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of reckless aggravated assault beyond a reasonable doubt.

The evidence was undisputed that, in the late evening and early morning between September 6 and September 7, 2002, the Defendant and the victim were on the Flashbacks dance floor.  The Defendant testified that he made contact with the victim's face.  One witness stated that the victim fell to the floor and bounced at least once.  Dr. Timmons indicated that the victim sustained a fractured skull and brain damage as a result of hitting the floor, which qualifies as a serious bodily injury.  The Defendant contends that the injury could have been caused when the victim's head bounced on the dance floor, but this explanation still would not break the causal chain of the Defendant's responsibility for making contact with the victim's face.  See McClenahan v. Cooley, 806 S.W.2d 767, 775 (Tenn. 1991).  We conclude that sufficient evidence exists in the record to support the Defendant's conviction for reckless aggravated assault.  This issue is without merit.

## B. Suppression of Undisclosed Evidence

The Defendant asserts that, because the State did not reveal until the trial was underway that it possessed notes from a conversation between the Defendant and Detective Wright, the trial court

should have suppressed the evidence.[3] Before the trial began, the Defendant filed a motion for discovery requesting that the State produce "any relevant written or recorded statements made by the Defendant or copies thereof as set forth in [Tennessee Rule of Criminal Procedure] 16(a)(1)(A)." Prior to the beginning of the trial, the State did not produce any statements made by the Defendant. Moments before he testified, Detective Wright approached defense counsel and told counsel that the Defendant made a statement to him on the phone. The Defendant objected to the admission of this testimony, and the trial court held a hearing outside the presence of the jury.

At the hearing, Detective Wright testified that he had mailed the Defendant a letter inquiring into the Defendant's whereabouts. The detective stated that the Defendant, responding via telephone, denied having been at Flashbacks in the past two years and claimed to be in Montana. Wright said that he typed a summary of this conversation into his records as the two talked. The detective stated that, although he did not advise the Defendant of his Miranda rights, he told the Defendant to contact a lawyer. The trial court held that the admission was spontaneous, and the conversation was admissible on cross-examination and rebuttal. However, the trial court held that testimony regarding this admission was "inappropriate" during the State's case-in-chief because the detective did not know for sure that the person on the phone was the Defendant. The trial court explained, "I think under the circumstances, it could be [admitted] under cross-examination later, it may become relevant and this witness may need to be called back in rebuttal." Following the State's case, the Defendant filed a motion to suppress Detective Wright's testimony regarding the Defendant's telephone admission to prevent the State from using the testimony "at any point" during the trial. The trial court denied that motion, stating that the testimony "could be used for cross-examination purposes." As a rebuttal witness, Detective Wright testified that the Defendant denied being at Flashbacks for the past two years. The detective testified that the Defendant said, "Hey me? Me, be involved in a crime? No, you got the wrong man. Not me, you know, I haven't even been to Flashbacks in two years."

During the hearing on the Defendant's motion for a new trial, the State told the trial court:

Regarding Officer Wright, the state takes exception to any inference that it did know about any statements that . . . Wright had from the defendant. The state learned that Officer Wright had spoken with the [defendant] moments before he testified, and . . . the state immediately advised Officer Wright to talk to defense counsel and tell him what[,] if anything[,] he knew or what he had gotten as far as statements went from the defendant.

The Court remembers . . . [that] the defendant was not in custody. He was not

<hr />

[3]The Defendant also contends that the trial court erred by not suppressing the conversation between the Defendant and Detective Wright because the admission of that evidence violated Tennessee Rule of Evidence 613(b), which states that "extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same." After a thorough examination of the record, we conclude that the Defendant has waived this issue because he failed to object to the evidence at trial based upon Rule 613(b) and failed to raise this issue in his motion for new trial. Tenn. R. App. P. 36(a).

being questioned. Officer Wright simply advised the defendant that I believe that he told him that he was being indicted for -- the case was being submitted to the grand jury. The defendant made self-serving statements to Officer Wright spontaneously without any kind of prodding that he had never been to Flashback[s], that he had nothing to do with it and that was it. [The Defendant] never admitted anything. He said nothing damaging. Again, they were all self-serving statements.

Tennessee Rule of Criminal Procedure 16 states:

(a) Disclosure of Evidence by the State.
(1) Information Subject to Disclosure.
(A) Statement of Defendant. Upon request of a defendant the State shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the State, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general; the substance of any oral statement which the State intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogations by any person then known to the defendant to be a law enforcement officer; and recorded testimony of the defendant before a grand jury which relates to the offense charged. . . .

(d) Regulation of Discovery. . . .
(2) Failure to Comply with a Request. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. . . .

Under Tennessee Rule of Criminal Procedure 16, the State has an obligation to disclose any written or recorded statements made by the Defendant and prepared by law enforcement officers. State v. Moore, 703 S.W.2d 183, 185 (Tenn. Crim. App. 1985); see State v. Brown, 552 S.W.2d 383, 386 (Tenn. 1977). The State may withhold disclosure of a statement it does not intend to offer in evidence only if that statement is oral. State v. Hicks, 618 S.W.2d 510, 513 (Tenn. Crim. App. 1981). Otherwise, the defendant has what has been described as "virtually an absolute right" to disclosure. Id. at 513-14 (citation omitted). This Court has held that Rule 16 covers "not only written, recorded and transcribed verbatim statements by a criminal defendant, but also written 'interpretation(s) or summar[ies]' of statements made by the accused, or a memorandum of an interview 'even though not verbatim and not signed' by the defendant." Id. at 514 (citation omitted); see State v. Delk, 692 S.W.2d 431, 436-37 (Tenn. Crim. App. 1985). In Delk, this Court held that a law enforcement agent's notes of an interview with the defendant constituted an "interpretation or summary" of the defendant's statement, and, under Hicks, were subject to full discovery by the defendant upon request. Delk, 692 S.W.2d at 436-37.

To enforce discovery violations under this rule, Tennessee Rule of Criminal Procedure 16(d)(2) provides that if there has been noncompliance, the trial court may order the offending party to permit the discovery or inspection, grant a continuance, prohibit the introduction of the evidence not disclosed or enter such other order as the court deems just under the circumstances. "Thus, it is clear that the court has wide discretion to fashion a remedy that is appropriate for the circumstances of each case and the sanction must fit the circumstances of that case." State v. Dennie Ray Loden, No. 03C01-9311-CR-00380, 1995 WL 23351, at *2 (Tenn. Crim. App., at Knoxville, Jan. 19, 1995), *perm. app. denied* (Tenn. 1995) (citing State v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984)); see State v. Leon Goins, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App., at Jackson, Dec. 27, 1999) *perm. app. denied* (Tenn. 2000). However, "evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated." State v. Garland, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981) (citing Tenn. R. Crim. P. 16(d)(2)). "The exclusionary rule should not be invoked merely to punish the state or the defendant for deliberate conduct in failing to comply with a discovery order." Id.

In this case, Detective Wright testified about what the Defendant said in their telephone conversation by referring to a typed summary. The Defendant did not learn of this summary until the trial had begun. The Defendant contends that the trial court erred by not suppressing Detective Wright's testimony about the Defendant's statement because the State violated Tennessee Rule of Criminal Procedure 16(a)(1)(A). The Defendant further contends that he was prejudiced by the trial court's failure to suppress the testimony because he may have changed his trial strategy if he had obtained the statement prior to trial and the statement was used to impeach his credibility. The State contends that: (1) the trial court never found a discovery violation; (2) the record is insufficient to show that the State acted without "diligent good faith efforts" to disclose information; and (3) the Defendant has not shown prejudice. We agree with the Defendant.

In this case, the State intended to call Detective Wright to testify about the Defendant's involvement in the altercation at Flashbacks. In preparing for his testimony, the existence of the recorded summary of the Defendant's statement should have been known or, by the exercise of due diligence, should have become known by the State. See Tenn. R. Crim. P. 16(a)(1)(A). Therefore, the State violated Tennessee Rule of Criminal Procedure 16(a)(1)(A) when it failed to produce Detective Wright's summary of the Defendant's statement prior to trial. While the trial court limited the use of the testimony concerning the Defendant's telephone conversation with Detective Wright, the trial court did not specifically find a Tennessee Rule of Criminal Procedure 16 violation. Therefore, we conclude that the trial court erred by failing to find a discovery violation under Rule 16. Having found a discovery violation, we now must determine what remedy the trial court should have granted under Tennessee Rule of Criminal Procedure 16(d)(2). Under the circumstances, we conclude that the only remedy that would have prevented actual prejudice to the Defendant was to prohibit Detective Wright's testimony concerning the Defendant's telephone conversation. Detective Wright's testimony actually prejudiced the Defendant because it impeached the Defendant's credibility after he testified in his own defense, and the prejudice could not be otherwise eradicated. Garland, 617 S.W.2d at 185. Thus, we conclude that the trial court erred by failing to exclude

Detective Wright's testimony about the Defendant's telephone conversation.

Having found error, we next determine whether the error is harmless. Tennessee Rule of Appellate Procedure 36(b) provides: "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." The Defendant claims that he might have changed his trial strategy if he had known of the statement prior to trial. In addition, the Defendant also asserts that the statement's admission damaged his credibility. The State contends that the Defendant has not shown prejudice in this case. We agree with the Defendant. If the Defendant had known about the recorded summary of his telephone conversation with the detective, the Defendant may have changed his trial strategy by not testifying and relying upon other witnesses' testimony during the trial. Additionally, the Defendant testified that he acted in self-defense when he struck the victim, and the Defendant's credibility to the jury was a crucial aspect of his claim of self-defense. The Defendant was notified moments before Detective Wright testified that the Defendant had made a prior statement to the detective. The statement was used by the State in rebuttal to attack the Defendant's credibility. Moreover, as the Defendant noted in his objections at trial and in his appellate brief, he may have altered his voir-dire strategy if he had known about the statement prior to trial. While we have held that the evidence was legally sufficient to support the Defendant's conviction, the State's proof of the Defendant's guilt was not overwhelming. We conclude that the error more probably than not affected the judgment below. Tenn. R. App. P. 36(b); see Hicks, 618 S.W.2d at 515 (holding that a Rule 16(a)(1)(A) violation was not harmless when the defendant's statement was used to impeach the defendant during cross-examination); State v. Terry Lynn Carter, No. W2001-02329-CCA-R3-CD, 2003 WL 402786, at *8 (Tenn. Crim. App., at Jackson, Feb. 20, 2003), *no perm. app. filed* (holding that a Rule 16(a)(1)(A) violation was not harmless when the State used the Defendant's written statement to impeach him on cross-examination and the State's proof of the Defendant's guilt was not overwhelming). Therefore, we reverse the Defendant's conviction and remand his case for a new trial.

## C. Flight Instruction

The Defendant contends that the trial court erred in charging the jury with flight. The trial court instructed the jury that:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination. The law makes no precise distinction as to the manner or method of flight. It may be open or it may be a hurried or concealed departure or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community or a leaving of the community for parts unknown

-13-

to constitute flight. If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight if flight is so proven together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the defendant, the reasons for it and the weight to be given to it are questions for you to determine.

This instruction is taken verbatim from the Tennessee Pattern Jury Instructions. See 7 Tenn. Practice, Tenn. Pattern Jury Inst.–Criminal 42.18 (2003). This pattern jury instruction is a correct statement of the applicable law and has been previously cited with approval by our court. See, e.g., State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996). In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction. There is sufficient evidence to support a jury charge on flight where there is proof of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or leaving the community for parts unknown." State v. Burns, 979 S.W.2d 279, 289-90 (Tenn.1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)); State v. Franks, No. W2003-0003-CCA-R3-CD, 2003 WL 22351024, *3 (Tenn. Crim. App., at Jackson, Oct. 14, 2003), *perm. app. denied* (Tenn. Nov. 13, 2003); see also Rogers v. State, 2 Tenn. Crim. App. 491, 455 S.W.2d 182, 187 (1970).

The trial court's flight instruction is appropriate in light of the evidence presented at trial. The Defendant admitted that he left the scene of the crime as soon as he hit the victim in the face. Other witnesses also testified that the Defendant fled the scene after the victim fell on the ground. The Defendant testified that he left the state shortly after the incident at Flashbacks. Detective Wright and Alicia Polston also discussed the Defendant's departure from Tennessee.[4] Therefore, the issue of flight was properly raised for the jury instruction. As fact finder, the jury was then left to decide the relevance of the Defendant's leaving.

### D. Duress and Necessity Instructions

The Defendant contends that the trial court should have charged the jury with the defenses of duress and necessity. We review the trial court's instructions to the jury de novo, with no presumption of correctness. See State v. David Wayne Smart, No. M2001-02881-CCA-R3-CD, 2003 WL 21077997, at *15 (Tenn. Crim. App., at Nashville, May 13, 2003), *perm app. denied* (Tenn. Oct. 13, 2003); see State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001). A trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[A] defendant has a constitutional

---

[4]We note that Detective Wright's testimony, in which the Defendant stated that he was not in Tennessee, was inadmissible due to the State's violation of Tennessee Rule of Criminal Procedure 16(a)(1)(A).

right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. Sandstrom v. Montana, 442 U.S. 510, 527 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

Because duress and necessity are defenses, rather than affirmative defenses, if the evidence fairly raises either defense, the trial court must submit the issue to the jury. Tenn. Code Ann. § 39-11-203(c) (1997); State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994) (citing State v. Hood, 868 S.W.2d 744, 748 (Tenn. Crim. App. 1993)). For a statutory defense to be raised by proof, "a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence," because the trial courts and appellate courts must avoid judging the credibility of the witnesses when making this determination. State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1994). When jury instructions are full, fair, and accurate statements of the law, a trial court is not required to provide special instructions. State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984); State v. Chestnut, 643 S.W.2d 343, 352 (Tenn. Crim. App. 1982). It is not error for a trial court to deny a request for special instructions when the court's instructions on a matter are proper. State v. Vann, 976 S.W.2d 93, 114 (Tenn. 1998).

### 1. Duress Instruction

The defense of duress is defined as follows:

> Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-504(a) (1997). "There must be no reasonable means to escape the compulsion to commit the offense." State v. Davenport, 973 S.W.2d 283, 288 (Tenn. Crim. App. 1998). This Court has stated:

> Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending, and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being

-15-

committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct. Tenn. Code Ann. § 39-11-504 (1989). The compulsion must be immediate and imminently present and of such nature to produce a well-founded fear of death or serious bodily harm. State v. Robinson, 622 S.W.2d 62 (Tenn. Crim. App. 1980).

State v. Green, 915 S.W.2d 927, 832 (Tenn. Crim. App. 1995).

In this case, the Defendant has not shown that the trial court erred in refusing to grant his request for a duress instruction to the jury. The trial court instructed the jury on self defense because of the testimony that the victim head-butted the Defendant. The Defendant has not suggested that the victim compelled the Defendant to commit aggravated assault through any continuous coercion toward the Defendant or his companions. The concern for the safety of the Defendant and his companions came after the assault had occurred. This issue is without merit.

## 2. Necessity Instruction

Regarding the defense of necessity, Tennessee Code Annotated section 39-11-609 (1997) states that except as provided in sections 39-11-611 to 39-11-621, conduct is justified if:

> (1) [t]he person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
> (2) [t]he desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

"The sentencing commission comments note that the statutory provision codifies the common law defense of necessity and excuses criminal conduct in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation." State v. Green, 995 S.W.2d 591, 606 (Tenn. Crim. App. 1998). Necessity is generally used when the extreme situation is brought on by something other than a human act. Davenport, 973 S.W.2d at 287 (citing Neil P. Cohen et al., Prevalence and Use of Criminal Defenses: A Preliminary Study, 60 Tenn. L. Rev. 957, 966 (1993)). "However, this court has rejected claims of error in a trial court's refusal to charge the defense of necessity in crimes of violence." State v. Marcus A. Terry, No. 02C01-9708-CR-00313, 1998 WL 775651, at *5 (Tenn. Crim. App., at Jackson, Nov. 6, 1998), *perm. app. denied* (Tenn. April 26, 1999).

The Defendant has not demonstrated that a non-human act prompted his assault on the victim. Furthermore, the trial court instructed the jury on self-defense. Accordingly, we conclude that the trial court properly rejected the Defendant's request for a necessity instruction. This issue is without merit.

## E.  Sentencing

The Defendant claims that the trial court erred in denying his application for diversion and in sentencing him to serve sixty days in jail as a requirement of his probation.  When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct."  Tenn. Code Ann. § 40-35-401(d) (2003).  This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts.  State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).  In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment.  Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).  The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous.  Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.  Moreover, the record must reflect that the court has weighed all of the factors in reaching its determination.  Bonestel, 871 S.W.2d at 168 (citing State v. Herron, 767 S.W.2d 151, 156 (Tenn. 1989)).  The court must explain on the record why the defendant does not qualify under its analysis, and, if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others.  Id.

At the sentencing hearing, the trial court found the following:

[W]e talk about the facts, that the victim came up to you, that was certainly the proof.  But also, if we're talking about the facts, the proof was the victim came up to you as a peacemaker. . . .

And so what we had was a terrible, terrible set of circumstances.  We're not just talking about . . . it's bad. [Anytime] people get hit and get hurt, that's terrible, that's bad.  But I think the Court would be derelict in [its] duties if it did not look at. . . what were the extent of these injuries[.] . . .

The jury said, and I think the facts support it, you caused it to be put in motion.  And then, this person is now seriously impaired.  It's not that he had a headache for an hour.  Although, that would be bad.  It's not that he had a cut on his jaw.  It's now, based on the proof that we had, he had some sight impairment, he had

some hearing impairment, because a grown up can't control himself.

Maybe it was the alcohol? I don't know. That's pathetic, for whatever reason. That is a horrible situation.

The Court feels that under all of the facts and circumstances of this case, under the extent, particularly the extent of the injuries involved in this case, diversion would not be appropriate.

And I think that society has an interest in this. I certainly do. And certainly, as pointed out maybe by your perspective, sure it would be great not to even have this on your record. But, I doubt seriously if this would -- I don't know, I can't say that, I don't know what the long[-]range effect of this would be. But I do know that society has a right to expect that when people are seriously injured from the actions of another, that [there are] some consequences for that.

## 1. Diversion

The Defendant argues that the trial court abused its discretion in declining to impose a sentence pursuant to Tennessee Code Annotated section 40-35-313 (1997 & Supp. 2002), commonly referred to as "judicial diversion." According to this statute, the trial court may, at its discretion, following a determination of guilt, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35- 313(a)(1)(A). A qualified defendant is one who:

(a) Is found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;
(b) Is not seeking deferral of further proceedings for a sexual offense or a Class A or Class B felony; and
(c) Has not previously been convicted of a felony or a Class A misdemeanor.

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i)(a), (b), (c). When a defendant contends that the trial court committed error in refusing to grant judicial diversion, we must determine whether the trial court abused its discretion by denying the defendant's request for judicial diversion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). Judicial diversion is similar to pretrial diversion; however, judicial diversion follows a determination of guilt, and the decision to grant judicial diversion is initiated by the trial court, not the prosecutor. State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). When a defendant challenges the trial court's denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. Cutshaw, 967 S.W.2d at 344; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In Anderson, this Court stated:

We conclude that judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under Tennessee Code Annotated § 40-15-105. Therefore, upon review, if "any substantial evidence to support the refusal" exists in the record, we will give the trial court the benefit of its discretion. Only an abuse of that discretion will allow us to overturn the trial court.

Anderson, 857 S.W.2d at 572 (citation omitted).

The criteria that the trial court must consider in determining whether a qualified defendant should be granted judicial diversion include the following: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others. Cutshaw, 967 S.W.2d at 343-44; Parker, 932 S.W.2d at 958. An additional consideration is whether judicial diversion will serve the ends of justice, i.e., the interests of the public as well as the defendant. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958; State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by* State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

The trial court found that "under all the facts and circumstances of this case, . . . particularly the extent of the injuries involved in this case, diversion would not be appropriate." The trial court has correctly noted that the offense is serious, especially with regard to the potentially career-altering injury sustained by the victim. The trial court also considered the deterrence value to the Defendant and others when it denied diversion. Therefore, we conclude that the trial court did not abuse its discretion by denying the Defendant's request for judicial diversion.

## 2. Probation

The Defendant contends that the trial court should not have ordered jail time. A defendant is eligible for alternative sentencing if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a) (2003). A defendant who is an especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(b)(6). In determining whether to grant or deny probation, the trial court may consider the following: the circumstances of the offense; the defendant's criminal record; background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. Parker, 932 S.W.2d at 958. A defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

-19-

Tennessee Code Annotated section 40-35-103(1) states that:

> Sentences involving confinement should be based on the following considerations: (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. . . ." Tenn. Code Ann. § 40-35-103(5). The trial court may consider enhancing and mitigating factors when determining a defendant's sentence. Tenn. Code Ann. §§ 40-35-114, -113.

In sentencing a defendant, the presumptive sentence for a defendant convicted of a Class B, C, D, or E felony shall be the minimum sentence in the range if no enhancing or mitigating factors are present. Tenn. Code Ann. § 40-35-210(c). When such factors are present, "the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e).

Because the trial court did not delineate its sentencing rationale adequately to provide us with a presumption, we must consider the sentence de novo. As the trial court noted, the Defendant caused serious bodily injury to the victim, who may no longer be able to continue his military service in the Navy. We conclude that no mitigating factors apply as listed under Tennessee Code Annotated section 40-35-113. However, as testimony during the sentencing phase indicated, the Defendant is a first-time offender who has positively contributed to the community. Furthermore, the incident occurred within a matter of seconds. Therefore, we conclude that the sentence of two years probation, of which the Defendant must serve sixty days on weekends is appropriate.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we REVERSE the Defendant's conviction and REMAND the case for a new trial.

_____
ROBERT W. WEDEMEYER, JUDGE